Michael K. Johnson (MN Bar # 258696)
Timothy J. Becker (MN Bar # 256663)
Kenneth W. Pearson (MN Bar # 016088X)
Alexandra W. Robertson (MN Bar # 0395619)
JOHNSON BECKER, PLLC
444 Cedar Street, Suite 1800
St. Paul, MN 55101
Office: 612-436-1800
mjohnson@johnsonbecker.com
tbecker@johnsonbecker.com
kpearson@johnsonbecker.com
arobertson@johnsonbecker.com

*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| JANE WASHINGTON, INDIVIDUALLY AND AS SUCCESSOR IN INTEREST AND SURVIVING HEIR OF HELEN E. SMITH, DECEASED,<br><br>Plaintiff<br><br>v.<br><br>AMYLIN PHARMACEUTICALS, LLC; ELI LILLY AND COMPANY; and NOVO NORDISK INC.,<br><br>Defendants | Case No.: 13md2452 AJB (MDD)<br><br>In re: Incretin-Based Therapies Products Liability Litigation<br><br>**MDL NO. 2452**<br><br>**FIRST AMENDED LONG FORM COMPLAINT FOR DAMAGES**<br><br>JURY TRIAL DEMANDED |

COMES NOW Plaintiff complains and alleges against Defendants and each of them as follows:

## GENERAL ALLEGATIONS

1.      Plaintiff, JANE WASHINGTON, Individually and as Successor in Interest and Surviving Heir of HELEN E. SMITH, deceased (hereinafter

"Plaintiff"), by and through undersigned counsel brings this action for personal injuries and wrongful death suffered as a proximate result of decedent HELEN E. SMITH ("Decedent") being prescribed and ingesting the defective and unreasonably dangerous prescription drugs Bydureon and Victoza ("Drugs"), prescription medications used to help lower blood sugar levels in adults with Diabetes Mellitus Type 2, which at all times relevant hereto, were manufactured, designed, tested, packaged, labeled, marketed, advertised, distributed, and sold by Defendants Amylin Pharmaceuticals, LLC, Eli Lilly and Company, and Novo Nordisk Inc..

2.     At all times herein mentioned, each of the Defendants, was the agent, servant, partner, aider and abettor, co-conspirator, and joint venturer of each of the remaining Defendants herein and were at all times operating and acting within the purpose and scope of said agency, service, employment, partnership, conspiracy, and joint venture and rendered substantial assistance and encouragement to the other Defendants, knowing that their conduct constituted a breach of duty.

3.     There exists, and at all times herein mentioned, there existed a unity of interest in ownership between certain Defendants and other certain Defendants such that any individuality and separateness between the certain Defendants has ceased and these Defendants are the alter ego of the other certain Defendant, and exerted control over those Defendants.  Adherence to the fiction of the separate existence of these certain Defendants as any entity distinct from other certain Defendants will permit an abuse of the corporate privilege and would sanction fraud and would promote injustice.

4.     The injuries and damages to Plaintiff were caused by the wrongful acts, omissions, and fraudulent representations of Defendants.

5.     At all times herein mentioned, Defendants were each engaged in the

- 2 -

business of, or were successors in interest to, entities engaged in the business of research, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging and/or advertising for sale or selling the Drugs, including in the States of California and Minnesota.

6.      At all times herein mentioned Defendants were each authorized to do or otherwise engaged in business within the States of California and Minnesota and did in fact supply the aforementioned product within the States of California and Minnesota, and nationwide.

7.      At all times herein mentioned, the officers and directors of Defendants authorized and directed the production and promotion of the Drugs when they knew, or with the exercise of reasonable care should have known, of the hazards and dangerous propensities of the Drugs, and thereby actively participated in the tortious conduct which resulted in the physical injuries described herein.

## **JURISDICTION AND VENUE**

8.      Jurisdiction is proper in this court pursuant to 28 USC §1332 for the reason that there is complete diversity of citizenship between Plaintiff and Defendants and the matter in controversy greatly exceeds the sum of seventy-five thousand dollars ($75,000.00), exclusive of interest and costs.

9.      This Court has jurisdiction over the non-resident Defendants because they have done business in the States of California and Minnesota, have committed a tort in whole or in part in the States of California and Minnesota, and have continuing contacts with the States of California and Minnesota, including but not limited to, engaging in the business of research, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging and/or

- 3 -

advertising for sale or selling the Drugs.

10.     Venue is further proper in this Court because Defendants conduct business in the District of California, including but not limited to, engaging in the business of research, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging and/or advertising for sale or selling the Drugs and subject to personal jurisdiction in the district.

## PLAINTIFF AND DECEDENT

11.     Plaintiff JANE WASHINGTON currently resides in Minneapolis, Minnesota. She is the surviving heir and successor in interest of HELEN E. SMITH, who was a resident of Minneapolis, Minnesota at the time Decedent ingested the Drugs, was diagnosed with pancreatic cancer, and ultimately died from pancreatic cancer. Plaintiff is bringing her individual claims, including a claim of wrongful death of Decedent, and the claims of the estate.

12.     Decedent was prescribed and used Bydureon in or around October 2014 and continued its use through at least May 2015.  Decedent was prescribed and used Victoza in or around March 2014 and continued its use through at least September 2014 and again in or around July 2015 through at least November 2018.  In or about October 2019, Decedent suffered severe physical, economic and emotional injuries as a result of said Drugs, including but not limited to being diagnosed with pancreatic cancer. Decedent subsequently died in November 2019 from pancreatic cancer.

## DEFENDANTS

13.     Amylin Pharmaceuticals, LLC f/k/a Amylin Pharmaceuticals, Inc. ("Amylin") is a Delaware limited liability company. The sole member of Amylin is BMS Holdco, Inc., a Delaware corporation with its principal place of business in New York. Amylin may be served by and through its registered agent: CT

Corporation System, 818 W. Seventh St., Los Angeles, California 90017. Amylin has conducted business and derived substantial revenue from within the state of California.

14.     Eli Lilly and Company ("Eli Lilly") is an Indiana corporation with its principal place of business located at Lilly Corporate Center, Indianapolis, Indiana 46285. Eli Lilly may be served by and through its registered agent: CT Corporation, 818 West Seventh Street, Suite 200, Los Angeles, California 90017.

15.     Novo Nordisk ("Novo Nordisk") is a Delaware corporation with its principal place of business located in New Jersey.  Novo Nordisk may be served by and through its registered agent: CT Corporation, 818 West Seventh Street, Suite 200, Los Angeles, California 90017.

## GENERAL FACTUAL ALLEGATIONS

16.     This is an action for injuries and damages suffered by Plaintiff as a direct and proximate result of the Defendants' negligent and wrongful conduct in connection with the design, development, manufacture, testing, packaging, promoting, marketing, distribution, labeling, and/or sale of the Drugs.  For the sake of completeness, the section also discusses the background of similar type-2 diabetes drugs.

17.     Defendants, directly or through their agents, apparent agents, servants or employees designed, manufactured, marketed, advertised, distributed, promoted, labeled, tested and sold the Drugs as a prescription that, along with diet and exercise, are designed to help lower blood sugar levels in adults with Type 2 Diabetes.

18.     According to the American Diabetes Association, "Type 2 Diabetes is the most common form of diabetes.  Millions of Americans have been diagnosed with Type 2 Diabetes. […] In Type 2 Diabetes, either the body does not produce enough insulin or the cells ignore the insulin.  Insulin is necessary for

—

the body to be able to use glucose for energy.  When you eat food, the body breaks down all of the sugars and starches into glucose, which is the basic fuel for the cells in the body.  Insulin takes the sugar from the blood into the cells. When glucose builds up in the blood instead of going into cells, it can lead to diabetes complications."[1]

19.     Type 2 Diabetes Mellitus is a chronic disease, characterized by insulin resistance and deficient insulin secretion leading to high blood sugar levels or 'hyperglycemia', which is the hallmark of the condition.

20.     Diabetes remains the most frequent cause of blindness, amputations and dialysis worldwide.[2]  With the current estimate of more than 350 million patients worldwide[3] it is considered to be one of the major health challenges of the 21st century.

21.     Janumet, Januvia, Victoza, Byetta, and Bydureon are supposed to help prevent these diabetic complications.

22.     The two most recently approved classes of therapeutic agents for the treatment of Type 2 Diabetes, glucagon-like peptide-1 (GLP-1) receptor (GLP-1R) agonists (such as Byetta) and dipeptidyl peptidase-4 (DPP-4) inhibitors (such as Janumet and Januvia), exert their actions through potentiation of incretin receptor signaling. Incretins are gut-derived hormones, principally GLP-1 and glucose-dependent insulinotropic peptide (GIP), that are secreted at low basal levels in the fasting state.

23.     Byetta was approved by the Food and Drug Administration ("FDA") on or about April 28, 2005, with an indication "to improve glycemic control in patients with type 2 diabetes mellitus who have not achieved adequate glycemic control on metformin, a sulfonylurea, or a combination of metformin and a

---

[1] http://www.diabetes.org/diabetes-basics/type-2/?loc=DropDownDB-type2
[2] *Id.*
[3] IDF Diabetes atlas, http://www.idf.org/diabetesatlas/5e/diabetes.

sulfonylurea."[4]

24.     Following FDA approval, Byetta was launched in North America in 2005.

25.     Bydureon was approved by the Food and Drug Administration ("FDA") on or about January 27, 2012; it is "a long-acting formulation of exenatide, an approved glucagon-like peptide 1 (GLP-1) receptor agonist marketed as an immediate-release formulation under the tradename, Byetta." [5]

26.     Following FDA approval, Bydureon was launched in North America in 2012.

27.     Both Bydureon and Victoza control hyperglycemia in type 2 diabetes in glucose-dependent fashion through GLP-1 receptor activation.[6]

28.     In February 2010, concerns were published regarding the GLP-1 drugs, including, Byetta and the DDP-4 inhibitors, including Janumet and Januvia, and their potential linkage with pancreatic cancer.

29.     Writing in DIABETES CARE, Butler *et al*. published *GLP-1–Based Therapy for Diabetes: What You Do Not Know Can Hurt You*'[7] wherein they wrote, "History has taught us that enthusiasm for new classes of drug, heavily promoted by the pharmaceutical companies that market them, can obscure the caution that should be exercised when the long-term consequences are unknown. Of perhaps greatest concern in the case of the GLP-1–based Drug, including GLP-1 agonists and dipeptidyl peptidase-4 (DPP-4) inhibitors, is preliminary evidence to suggest the potential risks of asymptomatic chronic pancreatitis and, with time, pancreatic cancer."

30.     In addition, these researchers wrote, "However, in the context of a

[4] https://www.accessdata.fda.gov/drugsatfda_docs/nda/2005/021773_Byetta_approv.PDF
[5] https://www.accessdata.fda.gov/drugsatfda_docs/nda/2012/022200Orig1s000SumR.pdf
[6] *Id.*
[7] Butler PC, Dry D, Elashoff D. GLP-1–Based Therapy for Diabetes: What You Do Not Know Can Hurt You Diabetes Care February 2010 33:453-455.

new class of medical therapy, the proverb 'What you do not know cannot hurt you' clearly does not apply.  We feel that enough preliminary evidence has accumulated to suggest that there is a plausible risk that long-term recipients of GLP-1–based therapy may develop asymptomatic chronic pancreatitis (Fig. 1), and worse, subsequently a minority of individuals treated by this class of Drug may develop pancreatic cancer."

31.     In February 2011, the journal Gastroenterology published on-line the work of Elashoff *et al.*[8] titled, *Pancreatitis, pancreatic, and thyroid cancer with glucagon-like peptide-1-based therapies*.

32.     These researchers used the FDA Adverse Event Reporting System (AERS) with the primary goal of their analysis being to assess the association between treatment with Byetta, or Januvia (and other DDP-4 inhibitors, which includes Janumet), and an adverse event report of pancreatitis, where Bydureon were listed as the primary suspect associated with a pancreatitis report in the database.  A secondary goal was to examine the FDA AERS database for reported pancreatic or thyroid cancer associated with use of Byetta or Januvia (and other DDP-4 inhibitors, which includes Janumet), with various other anti-diabetic drugs used as controls.  Metformin was not used as a control drug because it has been reported to decrease the risk of pancreatic cancer.

33.     These researchers reported that pancreatitis, inflammation of the pancreas, was >10-fold more frequently reported as an adverse event for patients administered Byetta and >6-fold more frequently reported in patients prescribed Januvia (and other DDP-4 inhibitors, such as sitagliptin, which includes Janumet). Both these associations were statistically significant.

34.     Because pancreatitis is a known risk factor for pancreatic cancer,[9]

---

[8] Elashoff M, Matveyenko AV, Gier B, Elashoff R & Butler PC  Pancreatitis, pancreatic, and thyroid cancer with glucagon-like peptide-1-based therapies. Gastroenterology (2011) 141:150-156.
[9] Rebours V, Boutron-Ruault MC, Schnee M, et al. The natural history of hereditary pancreatitis: a national series. Gut 2009;58: 97–103.

Elashoff *et al.* evaluated the reported rates of pancreatic cancer with Byetta and Januvia (and other DDP-4 inhibitors, such as sitagliptin, which includes Janumet) compared to control events relative to Avandia (rosiglitazone).

35.     The reported event rate for pancreatic cancer was 2.9-fold greater in patients treated with Byetta compared to other therapies.  The reported event rate for pancreatic cancer was 2.7-fold greater with Januvia (and other DDP-4 inhibitors, such as sitagliptin, which includes Janumet) than other therapies.

36.     Because pancreatitis acts as a risk factor for subsequent pancreatic cancer through the mechanisms of chronic inflammation and increased cell turnover,[10] it is not unforeseen that there is a progressive increased risk of pancreatic cancer with prolonged exposure to Bydureon.

37.     These researchers noted that the potential to increase the risk of cancer might be expected to occur by "permitting declaration of tumors previously held in check by an intact immune system" as has been published by others within the world's medical literature.

38.     On May 13, 2011, the Arzneimittelkommission der deutschen Ärzteschaft (Drug Commission of the German Medical Association – AkdÄ) published *Pancreatic cancers associated with exenatide (Byetta ®)* on its website.[11]  Byetta is a diabetes drug that acts like Januvia and Janumet.

39.     In the German adverse event database, reporting of pancreatic cancer was also unusually high in association with Byetta (11 cases in 4 years, with yearly 15,000-25,000 treated patients).[12]

40.     The period between the start of treatment with Byetta and a

---

[10] Bhanot UK, Moller P. Mechanisms of parenchymal injury and signaling pathways in ectatic ducts of chronic pancreatitis: implications for pancreatic carcinogenesis. Lab Invest 2009;89:489–497.

[11] http://www.akdae.de/Arzneimittelsicherheit/Bekanntgaben/Archiv/2011/20110513.html

[12] Arzneimittelkommission der deutschen Ärzteschaft. Aus der UAW-Datenbank": Pankreaskarzinome im Zusammenhang mit Exenatid (Byetta®). Dtsch Arztebl, (2011) 108: A-1080; (as cited by Vangoitsenhoven R, Mathieu C, Van Der Schueren B. GLP1 and cancer: friend or foe? Endocrine Related Cancer. 2012 Jun 12. [Epub ahead of print])

diagnosis of pancreatic cancer was on average 12.2 months (within a range of 2-33 months).

41.     The manufacturers of Byetta, Bydureon, Januvia, and Janumet have suggested that the most likely reason for the apparent association between the use of these drugs and acute pancreatitis is the increased risk of pancreatitis in patients with Type 2 Diabetes.[13]

42.     However, recent animal studies showing pancreatitis as a consequence of GLP-1 mimetic therapy challenge that assumption and lead to the conclusion that asymptomatic chronic pancreatitis is an adverse effect of GLP-1-based treatment, specific studies applied Stialinptin (active ingredient in Janumet)[14] and Exenatide (Byetta and Bydureon).[15]

43.     GLP-1 receptors are abundantly expressed in the pancreas, and Januvia and Janumet therapy has been shown to lead to increased pancreatic ductal replication, acinar to ductal metaplasia or cellular change, and, less commonly, acute pancreatitis in a rat model of type 2 diabetes.[16]

44.     Increased ductal turnover and acinar to ductal metaplasia are both well-established characteristics of chronic pancreatitis in humans.[17]

45.     It has also been suggested that immunomodulatory effects of DPP-4 inhibition might increase risk for all cancers.[18,19]

---

[13] Monami M, Lamanna C, Marchionni N, Mannucci E. Rosiglitazone and risk of cancer: a meta-analysis of randomized clinical trials. Diabetes Care 2008;31:1455–1460.

[14] Matveyenko AV, Dry S, Cox HI, et al. Beneficial endocrine but adverse exocrine effects of sitagliptin in the HIP rat model of type 2 diabetes, interactions with metformin. Diabetes 2009;58: 1604–1615.

[15] Nachnani JS, Bulchandani DG, Nookala A, et al. Biochemical and histological effects of exendin-4 (exenatide) on the rat pancreas. Diabetologia 2009;58:1604–1615.

[16] Matveyenko AV, Dry S, Cox HI, et al. Beneficial endocrine but adverse exocrine effects of sitagliptin in the HIP rat model of type 2 diabetes, interactions with metformin. Diabetes 2009;58: 1604–1615.

[17] Bhanot UK, Moller P. Mechanisms of parenchymal injury and signaling pathways in ectatic ducts of chronic pancreatitis: implications for pancreatic carcinogenesis. Lab Invest 2009;89:489– 497.

[18] Havre PA, Abe M, Urasaki Y, et al. The role of CD26/dipeptidyl peptidase IV in cancer. Front Biosci 2008;13:1634–1645.

[19] Matteucci E, Giampietro O. Dipeptidyl peptidase-4 (CD26): knowing the function before inhibiting the enzyme. Curr Med Chem 2009;16:2943–2951.

- 10 -

46.     Butler *et al.*[20] also reported that human and rodent pancreases contain numerous GLP-1 receptors in areas in which cancer is thought to originate, and mice that are genetically predisposed to pancreatic cancer develop the disease more quickly than usual in response to Byetta.

47.     In April 2012, Public Citizen, a non-profit consumer-advocacy organization based in Washington DC, sent a petition to the FDA to withdraw Victoza (liraglutide), a drug in the GLP-1 class, from the market.

48.     Dr. Sidney Wolfe, director of the health and research group at Public Citizen, said at that time, "We don't just go after Drug casually…(W)e only go after Drug when there is clear evidence of unique dangers or risks, and when there is no evidence of a unique clinical advantage."

49.     Dr. Wolfe said at the time that his concern extends to other diabetes drugs that alter the GLP-1 pathway, which would include Januvia, Janumet and Byetta.

50.     As a result of the defective nature of Janumet, Januvia, Victoza, Byetta, and Bydureon, persons who were prescribed and ingested Janumet, Januvia, Victoza, Byetta, and Bydureon for even a brief period of time, including Decedent herein, were at increased risk for developing life-threatening pancreatic cancer.  Once that cancer spreads, a patient stands just a 1.8% chance of surviving for longer than five years.

51.     Due to the flawed formulation of Bydureon, ingestion of Bydureon increases the risk of pancreatic cancer in those diabetic patients to whom it is prescribed.

52.     Defendants concealed their knowledge that Bydureon can cause life threatening pancreatic cancer from Plaintiff, Decedent, other consumers, the

---

[20] Gier B, Matveyenko AV, Kirakossian D, et al. Chronic GLP-1 Receptor Activation by Exendin-4 Induces Expansion of Pancreatic Duct Glands in Rats and Accelerates Formation of Dysplastic Lesions and Chronic Pancreatitis in the KrasG12D Mouse Model. Diabetes May 2012 vol. 61 no. 5 1250-1262

- 11 -

general public, and the medical community.  Indeed, the manufacturers of Januvia do not even mention 'pancreatic cancer' in their drugs' respective product inserts.

53.    Specifically, the Defendants did not adequately inform consumers and the prescribing medical community about the risks of pancreatic cancer associated with usage, nor did Defendants warn or otherwise advise physicians to institute monitoring procedures looking for the first signs of changes within the pancreas.

54.    The current warnings for Bydureon are simply inadequate.  The Defendants have failed and continue to fail in their duties to warn and protect the consuming public, including the Plaintiff herein.

55.    Even if the warnings were sufficient, which Plaintiff strongly denies, Bydureon still lacks any benefit sufficient to tolerate the extreme risk posed by the ingestion of these drugs.  Other drugs to treat diabetes are available. Bydureon is quite simply too dangerous and defective as formulated.  The Defendants should withdraw Bydureon from the market.

56.    Defendants willfully, wantonly, and with malice withheld the knowledge of increased risk of pancreatic cancer in users of Bydureon to prevent any chances of their product's registration being delayed or rejected by FDA.

57.    As the manufacturers and distributors of Bydureon, Defendants knew or should have known that Bydureon's usage was associated with pancreatic cancer.

58.    With the knowledge of the true relationship between use of Bydureon and pancreatic cancer, rather than taking steps to pull Bydureon off the market or provide strong warnings, Defendants promoted and continue to promote Bydueron as a safe and effective treatment for adults with Type 2 Diabetes.

59.    As pointed out by Dr. Butler et al.,  "The global market for Type 2

Diabetes drugs is worth US$20 billion...(T)hese drugs are the only ones that manufacturers have that are not off-patent, so if they disappear, they'd have nothing."

60.     While Defendants have enjoyed great financial success from their blockbuster drugs, they continue to place American citizens at risk of developing deadly pancreatic cancer.

61.     Consumers, including Decendent, who have used the Drugs for treatment of their Type 2 Diabetes had several alternative safer products available to treat their condition and have not been adequately warned about the significant risks and lack of benefits associated with Exenatide therapy.

62.     Defendants, through their affirmative misrepresentations and omissions, actively concealed from Plaintiff and Plaintiff's physicians the true and significant risks associated with the Drugs' use.

63.     As a result of Defendants' actions, Plaintiff and Plaintiff's physicians were unaware, and could not have reasonably known or have learned through reasonable diligence that Decedent would be exposed to the risks identified in this Complaint.   The increased risks and subsequent medical damages associated with Decedent's use of the Drugs use was the direct and proximate result of Defendants' conduct.

64.     At all times relevant hereto, the Defendants have directly marketed and distributed the Drugs to the medical community.

65.     At all times relevant hereto, the Defendants have directly marketed the Drugs to the consuming public throughout the United States, including the Plaintiff.

66.     Defendants departed from and failed to meet requirements of laws, regulations and class and product specific requirements including failing to undertake adequate post approval marketing studies on safety of the Drugs as

dictated by good pharmaceutical science standards.

Defendants both over-promoted the Drugs and under-warned about their risks, including:

     a.  in print advertising;

     b.  on their websites and blogs;

     c.  advertised to users that use of the Drugs was "safe" whereas it was not and Defendants knew or should have known it was not; and,

     d.  promoted the Drugs to doctors, clinics and users as safer than (or as safe as) other diabetes drugs.

67.    Defendants did not perform adequate safety testing on the Drugs as required by good pharmaceutical science practice.

68.    Defendants failed to provide proper and full information as to the safety of the Drugs.

69.    Defendants failed to ensure that full and correct safety labeling and warnings were used in pharmacy sheets that accompanied the Drugs to the purchaser.

70.    Defendants have never sought to enlarge their warnings to include a warning about pancreatic cancer risks associated with the use of the Drugs.

71.    Instead, Defendants marketed (and continue to market) the Drugs as having a low risk of side effects and continue to minimize the Drug's deadly side effects.

72.    Manufacturers such as the Defendants, herein, are required to have systems in place to collect and analyze any complaints they receive from doctors and hospitals about their products.

73.    Defendants did not timely apprise the F.D.A., the public or treating physicians of the defect(s) in Defendants' Drugs, despite Defendants' knowledge

that injuries had occurred and had been reported to Defendants due to the above-described defects.

74.   At all times mentioned herein, Defendants knew, or in the exercise of reasonable care should have known, that the Drugs were of such a nature that they were not properly designed, manufactured, tested, inspected, packaged, labeled, distributed, marketed, examined, sold, supplied, prepared, and/or provided with proper warnings, were not suitable for the purpose they were intended and were unreasonably likely to injure the products' users.

75.   Decedent and her prescribing health care providers were unaware of the true degree and incidence of pancreatic cancer associated with the use of the Drugs and would have used and prescribed other methods for diabetes control if they had been so informed.

76.   Decedent suffered from severe and personal injuries, which were permanent and lasting in nature, physical pain, and mental anguish, including diminished enjoyment of life, as well as the need for medical treatment, surgical intervention, monitoring and/or medications.

77.   As a direct and proximate result of the aforesaid conduct of Defendants and each of them as set forth hereinafter, Decedent suffered injuries, including but not limited to pancreatic cancer, which resulted in damages to Plaintiffs in a sum in excess of the jurisdictional limits of the Court.

78.   As a direct and proximate result of the aforesaid conduct of the Defendants, and each of them, Plaintiff was compelled to incur obligations for physicians, surgeons, nurses, hospital care, medicine, hospices, x-rays, medical supplies, and other medical treatment, the true and exact amount thereof being unknown to Plaintiff at this time, and Plaintiff prays leave to amend this complaint accordingly when the true and exact cost thereof is ascertained.

79.   As a further direct and proximate result of the said conduct of the

- 15 -

Defendants, and each of them, Plaintiff suffered a loss of income, wages, profits and commissions, a diminishment of earning potential, and other pecuniary losses, the full nature and extent of which are not yet known to Plaintiff; and leave is requested to amend this complaint to conform to proof at the time of trial.

80.     By reasons of the premises, Plaintiff has been caused great pain and suffering.

## STATEMENT OF PLAINTIFF'S INJURIES

81.     Decedent HELEN E. SMITH was prescribed and used the Drugs in or around October 2014 upon the direction of her physician for long-term maintenance of Type 2 Diabetes, and continued taking the Drugs until at least May 2015.

82.     As a direct result of the ingestion of the Drugs, Decedent HELEN E. SMITH was diagnosed with pancreatic cancer in or around October 2019. Had she and/or her physician been properly warned by Defendants regarding the risk of pancreatic cancer from usage of these prescription medications, Ms. SMITH'S physician would not have prescribed the Drugs and she would never had ingested these prescription medications.

83.     As a direct result of being prescribed the Drugs for this period of time, Decedent was permanently and severely injured, having suffered serious consequences from her usage of the Drugs, including but not limited to, the development of pancreatic cancer.

84.     Decedent, as a direct and proximate result of her use of the Drugs, suffered severe mental and physical pain and suffering, along with economic loss.

85.     As a proximate result of Defendants' acts and omissions, Decedent suffered the injuries described hereinabove due to her ingestion of the Drugs. Plaintiff accordingly seeks damages associated with these injuries.

86.     Decedent would not have used the Drugs had Defendants properly

- 16 -

disclosed the risks associated with their use.

## **FIRST CAUSE OF ACTION**

## **STRICT LIABILITY-FAILURE TO WARN**

(As to All Defendants)

87.     Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

88.     Defendants are liable under the theory of strict products liability. Defendants were at all times relevant to this suit, and are now, engaged in the business of designing, manufacturing, testing, marketing, and placing into the stream of commerce pharmaceuticals for sale to, and use by, members of the public, including the Drugs at issue in this lawsuit.  The Drugs manufactured by Defendants reached Decedent without substantial changes and were ingested as directed.  The Drugs were defective and unreasonably dangerous when they entered into the stream of commerce and when used by Decedent.

89.     HELEN E. SMITH was administered the Drugs for its intended purposes.

90.     HELEN E. SMITH could not have discovered any defect in the Drugs through the exercise of care.

91.     Defendants, as manufacturers of pharmaceutical drugs, are held to the level of knowledge of an expert in the field, and further, Defendants knew or should have known those warnings and other clinically relevant information and data which they distributed regarding the risks of injuries and even death associated with the use of the Drugs were incomplete and inadequate.

92.     HELEN E. SMITH did not have the same knowledge as Defendants and no adequate warning or other clinically relevant information and data was communicated to Decedent or Decedent's treating physicians.  The warnings that were given by the Defendants were not accurate, clear, and/or were ambiguous or

- 17 -

incomplete.

93.     Defendants had a continuing duty to provide consumers, including Decedent, and Decedent's physicians with warnings and other clinically relevant information and data regarding the risks and dangers associated with the Drugs, as it became or could have become available to Defendants.

94.     Defendants marketed, promoted, distributed and sold unreasonably dangerous and defective prescription drugs, the Drugs to health care providers empowered to prescribe and dispense the Drugs to consumers, including Decedent, without adequate warnings and other clinically relevant information and data. Through both omission and affirmative misstatements, Defendants misled the medical community about the risk and benefit balance of the Drugs, which resulted in injury to Decedent.

95.     Despite the fact that Defendants knew or should have known that the Drugs caused unreasonable and dangerous side effects, they continued to promote and market the Drugs without stating that there existed safer and more or equally effective alternative drug products and/or providing adequate clinically relevant information and data.

96.     Defendants knew or should have known that consumers, including Decedent, would foreseeably and needlessly suffer injury as a result of Defendants' failures.

97.     Defendants failed to provide timely and adequate warnings to physicians, pharmacies, and consumers, including Decedent and to Decedent's intermediary physicians, in at least the following ways:

  a.  Defendants failed to include adequate warnings and/or provide adequate clinically relevant information and data that would alert Decedent and Decedent's physicians to the dangerous risks of the Drugs including, among other things, their tendency to increase the risk of, and/or cause, the development of pancreatic cancer;

- 18 -

b. Defendants failed to provide adequate post-marketing warnings and instructions after the Defendants knew or should have known of the significant risks of, among other things, pancreatic cancer; and

c. Defendants continued to aggressively promote and sell the Drugs even after they knew or should have known of the unreasonable risks of developing pancreatic cancer from ingestion of the Drugs.

98.     Defendants had an obligation to provide Decedent and Decedent's physicians with adequate clinically relevant information and data and warnings regarding the adverse health risks associated with exposure to the Drugs, and/or that there existed safer and more or equally effective alternative drug products.

99.     By failing to provide Decedent and Decedent's physicians with adequate clinically relevant information and data and warnings regarding the adverse health risks associated with exposure to the Drugs, and/or that there existed safer and more or equally effective alternative drug products, Defendants breached their duty of reasonable care and safety.

100.     Defendants' actions described above were performed willfully, intentionally, and with reckless disregard of the life and safety of the Decedent and the public.

101.     Defendants' actions described above violated the federal and state Food, Drug and Cosmetic Acts and rendered the Drugs misbranded.

102.     As a direct and proximate result of the actions and inactions of the Defendants as set forth above, Decedent was exposed to the Drugs and suffered the injuries and damages set forth hereinabove.

## SECOND CAUSE OF ACTION

## STRICT PRODUCTS LIABILITY – DESIGN DEFECT

(As to All Defendants)

103.     Plaintiff hereby incorporates by reference all preceding paragraphs as

- 19 -

if fully set forth herein.

104.   Defendants are the manufacturers, designers, distributers, sellers and suppliers of the Drugs, who sold the Drugs in the course of business.

105.   The Drugs manufactured, designed, sold, marketed, distributed, supplied and/or placed in the stream of commerce by Defendants were expected to and did reach the consumer without any alterations or changes.

106.   The Drugs administered to Decedent were defective in design or formulation in the following respects:

a. When it left the hands of the Defendants, these drugs were unreasonably dangerous to the extent beyond that which could reasonably be contemplated by Decedent or Decedent's physicians;

b. Any benefit of the Drugs was outweighed by the serious and undisclosed risks of its use when prescribed and used as the Defendants intended;

c. The dosages and/or formulation of the Drugs sold by the Defendants was unreasonably dangerous;

d. There are no patients for whom the benefits of Drugs outweighed the risks;

e. The subject products were not made in accordance with the Defendants' specifications or performance standards;

f. There are no patients for whom the Drugs are safer and more efficacious than other drug products in their class; and/or

g. There were safer alternatives that did not carry the same risks and dangers that Defendants' the Drugs had.

107.   The Drugs administered to Decedent were defective at the time they were distributed by the Defendants or left their control.

108.   The foreseeable risks associated with the design or formulations of

- 20 -

the Drugs includes, but are not limited to, the fact that the design or formulation of the Drugs is more dangerous than a reasonably prudent consumer would expect when used in an intended or reasonably foreseeable manner, and/or did not have the claimed benefits.

109.    The defective and unreasonably dangerous design and marketing of the Drugs was a direct, proximate and producing cause of Decedent's injuries and damages. Under strict products liability theories set forth in Restatement (Second) of Torts, Defendants are liable to Plaintiff for all damages claimed in this case.

110.    As a direct, legal, proximate, and producing result of the defective and unreasonably dangerous condition of the Drugs, Decedent suffered personal injuries, economic and non-economic damages, including pain and suffering.

111.    Defendants' actions and omissions as identified in this Complaint show that Defendants acted maliciously and/or intentionally disregarded Decedent's rights so as to warrant the imposition of punitive damages.

### THIRD CAUSE OF ACTION
### NEGLIGENCE

(As to all Defendants)

112.    Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

113.    Defendants had a duty to exercise reasonable care in the manufacture, sale and/or distribution of the Drugs into the stream of commerce, including a duty to ensure that the products did not cause users to suffer from unreasonable, dangerous side effects.

114.    Defendants failed to exercise ordinary care in the manufacture, sale, testing, quality assurance, quality control, and/or distribution of the Drugs into interstate commerce in that Defendants knew or should have known that the Drugs created a high risk of unreasonable, dangerous side effects, including causing and

- 21 -

increasing the risk of developing pancreatic cancer.

115. Defendants were negligent in the design, manufacture, testing, advertising, warning, marketing and sale of the Drugs.

116. Despite the fact that Defendants knew or should have known that the Drugs caused unreasonable, dangerous side effects, Defendants continued to market the Drugs to consumers including Decedent.

117. Defendants knew or should have known that consumers such as Decedent would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care as described above.

118. Defendants willfully and deliberately failed to avoid those consequences, and in doing so, Defendants acted with a conscious disregard of the safety of Decedent as alleged previously.

119. As a proximate and legal result of Defendants' negligence, Decedent was caused to suffer the herein described injuries and damages.

## FOURTH CAUSE OF ACTION
## BREACH OF IMPLIED WARRANTY

(As to All Defendants)

120. Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

121. At all times mentioned in this Complaint, Defendants manufactured, compounded, packaged, distributed, recommended, merchandised, advertised, promoted, supplied and sold the Drugs, and prior to the time they was prescribed to Decedent, Defendants impliedly warranted to Decedent, and Decedent's physicians and healthcare providers, that the Drugs were of merchantable quality and safe for the use for which they were intended.

122. Decedent, Decedent's physicians, and healthcare providers relied on the skill and judgment of the Defendants in using and prescribing the Drugs.

- 22 -

123.    The products were unsafe for their intended use, and they were not of merchantable quality, as warranted by Defendants, in that the Drugs had very dangerous propensities when put to their intended use and would cause severe injury (or death) to the user.  The Drugs was unaccompanied by adequate warnings of their dangerous propensities that were either known or reasonably scientifically knowable at the time of distribution.

124.    As a proximate and legal result of the defective and unreasonably dangerous condition of the Drugs manufactured and supplied by Defendants, Decedent was caused to suffer the herein described injuries and damages.

125.    After Decedent was made aware or otherwise came to believe that the injuries discussed herein were a result of the Drugs, notice was duly given to Defendants of the breach of said warranty.

## FIFTH CAUSE OF ACTION
## BREACH OF EXPRESS WARRANTY

(As to All Defendants)

126.    Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

127.    The aforementioned manufacturing, compounding, packaging, designing, distributing, testing, constructing, fabricating, analyzing, recommending, merchandizing, advertising, promoting, supplying and selling of the Drugs was expressly warranted to be safe for use by Decedent, and other members of the general public.

128.    At the time of the making of the express warranties, Defendants had knowledge of the purpose for which the Drugs were to be used and warranted the same to be in all respects, fit, safe, and effective and proper for such purpose.  The Drugs were unaccompanied by adequate warnings of their dangerous propensities that were either known or knowable at the time of distribution.

- 23 -

129.    Decedent and Decedent's physicians reasonably relied upon the skill and judgment of Defendants, and upon said express warranty, in using the Drugs. The warranty and representations were untrue in that the product was unsafe and, therefore, unsuited for the use for which they were intended.  The Drugs could and did thereby cause Decedent to suffer the herein described injuries and damages.

130.    As soon as the true nature of the products and the fact that the warranty and representations were false were ascertained, Defendants were notified of the breach of said warranty.

## SIXTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION
### (As to All Defendants)

131.    Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

132.    Defendants owed a duty in all of their several undertakings, including the communication of information concerning the Drugs, to exercise reasonable care to ensure that they did not, in those undertakings, create unreasonable risks of personal injury to others.

133.    Defendants disseminated information to physicians concerning the properties and effects of the Drugs, with the intent and expectation that physicians would rely on that information in their decisions regarding the prescribing of drug therapy for their patients.

134.    Alternatively or in addition, when Defendants disseminated information to physicians concerning the properties and effects of the Drugs, they should have realized, in the exercise of due care to avoid causing personal injury to others, that physicians would reasonably rely on that information in their decisions concerning the prescription of drug therapy for their patients.

135.    By uniformly honored custom and practice, the label for a

- 24 -

prescription drug product, whether name brand or generic, as it is distributed to pharmacies for dispensing to patients, per the prescriptions of their physicians, accompanies or is placed on or in the package from which the drug is to be dispensed.

136.    A drug company will generally distribute to physicians the labels for a name brand prescription drug product along with samples of the product, when it is being introduced to the market, and disseminate the content of the labels (i.e., the product labeling) to physicians through publication of the drug's monograph in the PDR, and otherwise communicate information regarding the drug through advertising, distribution of promotional materials, sales presentations by company sales representatives, group sales presentations, and sponsored publications and seminar speakers.

137.    Defendants disseminated false information, as referenced above, to physicians and the medical community and to their patients with knowledge that the information was false or in conscious disregard of its truth or falsity.

138.    Defendants disseminated the false information, as referenced above, to physicians, the medical community and their patients with the intention to deceive physicians and their patients and to induce the physicians to prescribe the Drugs.

139.    Alternatively or in addition, Defendants failed to exercise reasonable care to ensure that the information disseminated to physicians concerning the properties and effects of the Drugs were accurate and not misleading, Defendants failed to exercise reasonable care to insure that accurate and not misleading information was disseminated to physicians concerning the properties and effects of the Drugs by failing to publish or disseminate current and accurate information.

140.    Defendants expected or should have expected that patients taking the Drugs, pursuant to prescriptions written or issued in reliance on false information,

would be placed in unnecessary, avoidable, and unreasonable danger due to unwarranted exposure to the Drugs.

141.   As a proximate and foreseeable result of this dissemination to physicians, by Defendants consciously or negligently disseminating false information, the Decedent suffered grievous bodily injury, and consequent economic and other loss, as described above, when Decedent's physicians, in reasonable reliance upon the negligently inaccurate, misleading and otherwise false information disseminated by these defendants, and reasonably but unjustifiably believing the information to be true, prescribed for the Decedent the Drugs.

142.   As a result of the foregoing negligent misrepresentations by Defendants, and each of them, the Decedent was caused to suffer the herein described injuries and damages.

## SEVENTH CAUSE OF ACTION
## FRAUDULENT CONCEALMENT

(As to All Defendants)

143.   Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

144.   At all times mentioned in this Complaint, Defendants had the duty and obligation to disclose to Decedent and to Decedent's physicians, the true facts concerning the Drugs, that is, that the Drugs were dangerous and defective, and likely to cause serious health consequences to users, including the injuries as described in this Complaint.

145.   Defendants concealed important facts from Decedent and from Decedent's physicians and healthcare providers which facts include, but are not limited to, the fact that Defendants:

    a.  Failed to disclose any connection between use of the Drugs and the development of pancreatic cancer;

- 26 -

b. Did not inform prescribers and users of studies related to use of the Drugs and the development of pancreatic cancer, and

c. Concealed from prescribers and users that numerous adverse events have been reported linking use of the Drugs to pancreatic cancer.

146.   At all times mentioned in this Complaint, Defendants made affirmative representations to Decedent and Decedent's prescribing physicians prior to the day the Drugs were first prescribed to Decedent that Drugs were safe as set forth above while concealing the material facts set forth herein.

147.   At all times mentioned in this Complaint, Defendants had the duty and obligation to disclose to Decedent and to Decedent's physicians and healthcare providers the true facts concerning the Drugs, which facts include, but are not limited to, the fact that the Drugs were dangerous and likely to cause serious health consequences to users, including pancreatic cancer.

148.   At all times mentioned in this Complaint, Defendants intentionally, willfully, and maliciously concealed or suppressed the facts set forth above from Decedent's physicians, and therefore from Decedent, with the intent to defraud as alleged herein.

149.   At all times mentioned in this Complaint, neither Decedent nor Decedent's physicians nor healthcare providers were aware of the concealed facts set forth herein. Had they been aware of those facts, they would not have acted as they did, that is, that the Drugs would not have been prescribed as part of Decedent's treatment and Decedent would not have been injured as a result.

150.   Had Decedent been informed of the deaths and serious injury adverse reports associated with usage of the Drugs, Decedent would have immediately discontinued the Drugs or never taken the medication.

151.   As a proximate result of the concealment or suppression of the facts

- 27 -

set forth above, Decedent, Decedent's physicians and healthcare providers reasonably relied on Defendants' deception and, Decedent was prescribed the Drugs and subsequently sustained injuries and damages as set forth in this Complaint. Defendants' concealment was a substantial factor in causing the injuries described herein.

152. As a result of the foregoing fraudulent and deceitful conduct by Defendants, and each of them, Plaintiff, for the sake of example and by way of punishing Defendants, seeks punitive damages according to proof.

153. As a result of the foregoing fraudulent and deceitful conduct by Defendants, and each of them, Decedent was caused to suffer the herein described injuries and damages.

## EIGHTH CAUSE OF ACTION
## WRONGFUL DEATH

(As to All Defendants)

154. Plaintiffs hereby incorporate by reference all preceding paragraphs as if fully set forth herein.

155. Plaintiff is the surviving heir and successor in interest to Decedent HELEN E. SMITH. Decedent was prescribed, supplied with, received, took, used and consumed the Drugs as tested, studied, researched, evaluated, endorsed, designed, formulated, compounded, manufactured, produced, processed, assembled, inspected, distributed, marketed, labeled, promoted, packaged, advertised for sale, prescribed, sold, or otherwise placed in the stream of interstate commerce by Defendants.

156. The injuries and damages the Plaintiff and Injured Party were caused by the wrongful acts, omissions, and fraudulent misrepresentations of Defendants.

157. As a result of the conduct of Defendants and the use of Defendants' Drugs, Ms. SMITH suffered catastrophic and ultimately fatal injuries.

- 28 -

158.    Plaintiff is entitled to recover economic and non-economic damages against all Defendants for wrongful death directly and legally caused by the defects in Defendants' Drugs and the negligent conduct, acts, errors, omissions, and intentional and negligent misrepresentations of Defendants, and each of them.

159.    Plaintiff, as successor in interest to the estate of her late sister, further pleads all wrongful death damages allowed by statute and law in the state of Minnesota, where the cause of action accrued.

## NINTH CAUSE OF ACTION
## SURVIVAL ACTION
(As to All Defendants)

160.    Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

161.    As a direct and proximate cause of Defendants conduct, as outlined above, HELEN E. SMITH suffered injury and disability prior to her death.   This resulted in pain and suffering, mental anguish, loss of capacity of the enjoyment of life, hospital and other medical expenses, loss of earning and loss of earning capacity prior to her death.

162.    Plaintiff, as successor in interest to the estate of her late sister, brings this claim for damages on behalf of Ms. SMITH's heirs, as she may have maintained herself prior to her death.

## TENTH CAUSE OF ACTION
## PUNITIVE DAMAGES

163.    Plaintiff hereby incorporates by reference all preceding paragraphs as if fully set forth herein.

164.    Although Defendants knew or recklessly disregarded the fact that the Drugs caused debilitating and potentially lethal side effects, Defendants continued to market the Drugs to consumers, including Plaintiff, without disclosing these side

- 29 -

effects when there were safer alternative methods for treating Type 2 Diabetes.

165.    Defendants knew of the Drugs' defective nature, as set forth herein, but continued to design, manufacture, market, and sell them so as to maximize sales and profits at the expense of the health and safety of the public, including Plaintiff, in conscious and/or negligent disregard of the foreseeable harm caused by the Drugs.

166.    Defendants intentionally concealed or recklessly failed to disclose to the public, including Plaintiff, the potentially life-threatening side effects of the Drugs to ensure its continued and increased sales.  Defendants failed to provide warnings that would have dissuaded physicians from prescribing the Drugs and consumers from purchasing and consuming the Drugs, thus depriving physicians and consumers from weighing the true risks against the benefits of prescribing and/or purchasing and consuming the Drugs.

167.    The aforementioned conduct of Defendants was willful and wanton and was committed with knowing, conscious, and deliberate disregard for the rights and safety of consumers such as Decedent, thereby entitling Plaintiff to punitive damages in an amount appropriate to punish Defendants and deter them from similar conduct in the future.

CIVIL COMPLAINT FOR DAMAGES

## **PRAYER FOR DAMAGES**
## **INCLUDING PRAYER FOR RELIEF FOR**
## **SURVIVAL AND WRONGFUL DEATH**

**WHEREFORE,** Plaintiff prays for relief on the entire Complaint as follows:

1. Actual damages as alleged jointly and severally against Defendants, in excess of $75,000.00;

2. Economic damages, including wage loss and loss of earning capacity in an amount to be determined at trial;

3. Medical expenses, including for past treatment, in an amount to be determined at trial;

4. Non-economic damages, including pain and suffering;

5. All wrongful death and survival damages;

6. Burial and funeral expenses;

7. Punitive damages, including attorney's fees, in excess of $75,000;

8. All pre-judgment and post-judgment interest at the highest legal rate available under relevant law;

9. Attorney's fees, expenses, and costs of this action; and

10. Such further relief as this Court deems necessary, just, and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.

- 31 -

1

2

3    Dated: December 4, 2020          Respectfully sumbitted,

4
                                     /s/ Michael Johnson
5

6                                    Michael K. Johnson (MN Bar # 258696)
                                     Timothy J. Becker (MN Bar # 256663)
7                                    Kenneth W. Pearson (MN Bar # 16088X)
                                     Alexandra W. Robertson (MN Bar # 0395619)
8                                    JOHNSON BECKER, PLLC
9                                    444 Cedar Street, Suite 1800
                                     St Paul, MN 55101
10                                   Office: 612-436-1842
11                                   mjohnson@johnsonbecker.com
12                                   tbecker@johnsonbecker.com
                                     kpearson@johnsonbecker.com
13                                   arobertson@johnsonbecker.com

14

15                                   *Attorneys for Plaintiff*

16

17

18

19

20

21

22

23

24

25

26

27

28

- 32 -

CIVIL COMPLAINT FOR DAMAGES